**ABC VENDING CORP. v. ZUSSMAN.**

Civ. No. 51–892.

United States District Court
D. Massachusetts.

June 26, 1952.

Robert W. Meserve, Nutter McClennen & Fish, Boston, Mass., for plaintiff.

Thomas A. Flanagan, Flanagan & Learner, Boston, Mass., for defendant.

FORD, District Judge.

The evidence of one Edward Glassman, offered by the defendant, is stricken from the record because of insufficient identification of the corn tested.

### On the Merits.

This is a contract action in which plaintiff, the buyer under two contracts for the sale of a total of one million pounds of popcorn, seeks to recover damages from the defendant seller for failure to deliver a part of the corn called for by the contract, and for breach of warranty as to the quality of part of the corn which was delivered.

There is no doubt that defendant did not deliver some 767,500 pounds of the one million to be delivered under the contract. The important question as to this claim of the plaintiff is whether plaintiff by failure to pay on time for the corn already delivered, furnished justification for the rescission of the contract by defendant on March 24, 1951. The parties disagree as to whether payment was due within ten days after receipt of the corn by the buyer or within ten days after delivery to the carrier. But it is clear from the whole of the evidence that whether or not payments were made on time, the true picture is that by February 16, 1951 all payments for corn already delivered had been made, that defendant had not then, nor indeed until March 24, 1951, indicated that he claimed any right to rescind on grounds of delay in payment, and that as to corn shipped after February 16, 1951, plaintiff was justified in withholding payment because defendant made it clear that in a rising market he was unable to obtain corn for further shipments under the contract, and would not make all the required deliveries unless plaintiff paid him in advance the sums necessary to pay the banks and obtain release of warehouse receipts on corn which he had stored.

As to the breach of warranty claim, the chief argument in defense rests on the alleged failure of plaintiff to comply with the contract provisions for notice and further tests of the corn in the presence of a representative of the seller. Defendant, however, was given timely notice of the claim that the corn was not of proper quality, and while plaintiff did not technically invite defendant to send a representative for further tests, defendant never requested that he be given the opportunity to do so, but instead entered into negotiations looking toward the disposition of the corn. Hence, he must be held to have waived his right of inspection given in the contract. That the corn was in fact of inferior quality is indicated by the fact that plaintiff sold it at a loss, and bought other corn to replace it at more than the contract price, while defendant failed to take it back, repaying plaintiff the contract price and shipping charges, when, admittedly, at the then market, the corn, if of top quality, could have been readily resold at a price which would have given defendant a substantial profit.

In accordance with this memorandum and the detailed findings of fact and conclusions of law filed herewith, judgment will be entered for the plaintiff, with costs.

### Findings of Fact.

1. The plaintiff and the defendant entered into two contracts in the fall of 1950 under which the defendant agreed to sell and the plaintiff agreed to buy a total of a million pounds of popcorn at an average price of $6.75 per hundred weight, the corn to be delivered as called for by the plaintiff any time after January 1, 1951 and to be delivered as to 500,000 pounds by June

30, 1951 and as to the remainder, by September 30, 1951.

2. The defendant delivered a total of 232,500 pounds of popcorn and failed and refused to deliver any more corn, although the defendant beginning in February 1951 repeatedly ·requested the delivery of the remaining 767,500 pounds.

3. The plaintiff, after the defendant refused and failed to deliver the remainder of the corn under the contract, purchased in the open market, in substantial lots and from processors, during the period between April 3, 1951 and September 6, 1951, a total of 758,300 pounds of popcorn for which it paid a total price of $67,490, or an average of $8.88 per hundred weight, The plaintiff thus paid for this corn $2.13 per hundred weight, on the average, more than the contract price of $6.75. The market price of corn of the quality the defendant had contracted to deliver at or about the time the defendant failed and refused to deliver the same and at all material times was $8.88 per hundred weight.

4. The plaintiff used its best efforts to replace the corn that the defendant failed to deliver at the lowest possible price and in fact replaced all but about 9,000 pounds of the corn the defendant failed and refused to deliver. This replacement corn was in addition to the corn which dealers delivered to the plaintiff under contracts executed in the fall of 1950.

5. By reason of the defendant's failure to deliver corn to the plaintiff the plaintiff has therefore suffered a loss of $16,347.75 based on a difference in market price of $2.13 per hundred weight on the 767,500 bags the defendant failed to deliver or, at the same rate, an actual loss on the corn the plaintiff purchased of $16,173.09, since it purchased some 9,000 pounds less than it was entitled to receive under the contract.

6. The only reason which the defendant claims entitled him to refuse to deliver this corn was the alleged failure of the plaintiff to pay for corn in accordance with the terms of the contract which provided for payment "within ten days after delivery". The defendant also claimed that the plaintiff had agreed to pay for the corn "promptly" upon the receipt of invoice and bill of lading. The defendant claims that, under the language of the contract, it was entitled to payment within ten days after delivery to the carrier at Fremont, Nebraska, at the latest.

7. Prior to February 16, 1951, the plaintiff had paid for all popcorn which had been delivered by the defendant before that date under the contracts now in suit, and the defendant had never claimed a right to rescind or refuse to perform the contract because of failure to pay within the time fixed by the contract or within the time fixed by the agreement.

8. Athough one of the defendant's invoices is dated February 23, 1951, the bill of lading ·covering that shipment was alleged to be dated March 1, 1951, and if it be assumed that the plaintiff was obligated to pay for the corn ten days after delivery to the carrier, as evidenced by the date of the bill of lading, the plaintiff was not obliged to pay any amount between a date prior to February 16, 1951 and March 11, 1951 at the earliest. ·Actually, it appeared no bill of lading on this shipment was sent to plaintiff until after March 12, 1951.

9. Prior to March 11, 1951, the defendant had stated that he would be unable to perform the contract by delivering corn in accordance with its terms, and the plaintiff, therefore, reasonably anticipated that it would incur loss because of the necessity of purchasing popcorn to replace the corn the defendant had contracted (and now refused) to deliver.

10. On February 16, 1951, the plaintiff had ·complained of failures to deliver corn as requested to the West Coast and on February 23, 1951, the defendant wrote "I do not know if we will have very much corn available until sometime in September; however, it is quite possible in view of the fact that I am out calling on the farmers to see what can be done about getting some of our corn in that I may be able to fill some of your orders sooner", and stated that the defendant expected "to ship a car to the West Coast about the first week in April", not having delivered any corn there since January although the allotment of the plaintiff called for minimum delivery of 100 bags per month. The plaintiff then

referred the matter of enforcing the performance of these contracts to its counsel who, on March 1, 1951, wrote to the defendant requiring delivery, demanding prompt performance of the contract and warning the defendant of the necessity of the plaintiff's purchasing replacement corn at a price greatly in excess of the contract price. The defendant never answered this letter but, on March 8, 1951, called an agent of the plaintiff and advised him that he could not perform the contract and would not have any corn whatever available for shipping under the contract until the end of March or beginning of April. The plaintiff advised the defendant that this meant a breach of contract. It was not until after these events had transpired that the plaintiff failed to pay for corn when payment was first due not earlier than March 11, 1951.

11. Such failure to pay as thereafter occurred was justifiable and reasonable in view of the defendant's repeated statement that he could not and would not perform the contract.

12. On March 13, 1951, the defendant, who had then, or shortly thereafter, received substantial orders from the plaintiff for the delivery of corn, advised the plaintiff that the plaintiff had defaulted on the contract and requested a conference. The reason for the claim of default was not indicated in this letter. At the requested conference held on March 16, 1951, the defendant reiterated that he was unable to deliver corn under this contract because he had no corn to deliver. It was only thereafter, by his letter of March 25, 1951, that the defendant purported to rescind the contract. At this time, the plaintiff apparently was indebted to the defendant for two shipments of corn aggregating about $4,725 (including freight, which the defendant had advanced in accordance with the arrangement between the parties). The greater part of this amount ($3,375) was paid on March 29 and thereafter, on April 6, 1951, the defendant told the plaintiff he was completely out of corn and could not ship the balance of the corn unless the plaintiff was willing to pay $8.50 per hundred pounds for corn held under warehouse receipts. This the plaintiff refused to do.

13. Under all circumstances, the action of the plaintiff in holding up payment for corn delivered was reasonable in view of the defendant's stated inability to perform his contract and the risk of loss thereunder. Under all circumstances, there was no unreasonable delay in the payment of invoices where the time of payment was not a matter of the essence by the terms of the contract. Under all the circumstances, the plaintiff paid for the corn actually delivered in a reasonable time and has now paid for all of it. Since payment was so made in a reasonable time, or prompt payment was excused, the defendant was still obligated to perform his contracts with the plaintiff. Under all the circumstances, including the conversation of April 6, 1951, the defendant waived any right he might have had to rescind the contract.

14. About May 25, 1951, the plaintiff began to pop some of the corn delivered by the defendant in January 1951. On May 29, the plaintiff advised the defendant in writing that the corn was of defective quality and had a popping expansion of less than 30 to 1. Thereafter, on June 1, 1951, the defendant called an agent of the plaintiff and agreed to take back the corn for cash for a price stated, consisting of the cost of the corn and freight. The defendant at no time requested an opportunity to inspect the corn in actual popping or to be present when the corn was tested in the so-called OVT tester. The defendant did not take back the corn and did not pay therefor.

15. The corn delivered in January and February by the defendant (of which about 800 bags remained in the hands of the plaintiff at the time the letter of May 29 was written), did not give a minimum expansion of 30 in actual popping as the defendant had warranted it would, and was not (as the contract provided it would be) carefully screened and processed with no butt ends, in what is known as prime selection and in prime popping condition, but was in fact a poor grade of popcorn mixed with field corn and gave excessive waste when popped, about $2\frac{1}{2}$ to 3 times the normal amount.

16. The plaintiff's delay in notifying the defendant of the breach of the warranties contained in the contract was reasonable, in view of its failure to use the corn until May, and the defendant was not harmed thereby. While the defendant was not notified and requested to have a representative present for further testing, neither did he request that such tests be made, and by the agreement of June 1, 1951, he waived the provisions as to such tests contained in the original contract.

17. In any event, the provisions as to tests related only to the failure of the corn to give a popping expansion of 30 to 1 in the Cretor machines, and did not relate to the general failure of the defendant to deliver corn in prime selection and in prime popping condition, which was a separate and independent warranty as to which the contract gives no inspection rights.

18. The defendant breached his warranty under these contracts by delivering corn that did not give a minimum expansion of 30 in actual popping, but an expansion of only 24 to 26.

19. The defendant breached his warranty by failing to deliver corn carefully screened and processed with no butt ends, in what is known as prime selection and in prime popping condition, as he had warranted he would.

20. The plaintiff popped about 180 bags of corn, and by reason of the defendant's failure to provide corn of the type warranted, the plaintiff suffered an excess of loss with regard to this corn amounting to about 18% and on this quantity of corn, therefore, lost at least $218.70. The plaintiff found the popping of such corn uneconomical and thereafter disposed of the remainder of the corn for chicken feed receiving the best price it could for corn of this quality, or $3.02 per hundred weight. With regard to the 669 bags so sold, the plaintiff sustained an additional loss of $2,492. The total loss sustained by the plaintiff as a result of the defendant's breach of warranty on the corn delivered to New York amounted to $2,710.70 at least.

21. The total loss sustained by the plaintiff as a result of the defendant's failure to deliver the quantity of corn specified in the contract ($16,347.75), and the defective quality of the corn actually delivered under the contract ($2,710.70), caused a total loss to the plaintiff of $19,058.45, to which must be added interest from the date of the breach, which was, at the latest, June 1, 1951, the interest thus amounting to $1,143.40 to June 1, 1952. The plaintiff, therefore, is entitled to a judgment of $20,201.85, with its costs.

## Conclusions of Law.

1. The defendant is liable to the plaintiff for the difference between the contract price per unit at which the defendant contracted to deliver popcorn and the market price at the date as of which the defendant failed and refused to deliver popcorn, multiplied by the quantity of corn that the defendant failed to deliver.

2. Nothing in the conduct of the plaintiff caused the defendant's failure to deliver or excused the defendant's failure to deliver.

3. Insofar as there was any delay in payment by the plaintiff to the defendant prior to February 16, 1951, the defendant has by his conduct waived the same, and insofar as there was any delay in payment subsequent to February 16, 1951, the plaintiff was justified in such delay by reason of the conduct of the defendant.

4. By his failure to insist thereon when notified of the breach of warranty, the defendant waived the right of inspection contained for his benefit in the contract between the parties.

5. Judgment will be entered for the plaintiff in the sum of $20,201.85, with costs.